USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUTZLER MANUFACTURING
COMPANY, INC.,

                    Plaintiff,

        - against -

BRADSHAW INTERNTIONAL, INC.,

                    Defendant.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 7211 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      Plaintiff Hutzler Manufacturing Company, Inc. ("Hutzler") has moved for a preliminary injunction against Defendant Bradshaw International, Inc. ("Bradshaw"), alleging that Bradshaw infringed Hutzler's design patents for garlic and onion storage containers. For the reasons set forth below, Hutzler's motion will be GRANTED.

## BACKGROUND

      Plaintiff Hutzler is the manufacturer of a line of plastic housewares products called the "Food Saver Line," which is used for storing and preserving various types of produce. (Cmplt. ¶ 9) Hutzler owns U.S. patents for two products in the Food Saver Line – the "Onion Saver" and the "Garlic Saver" – which resemble the type of produce they are intended to store. (Id.) On March 13, 2007, the United States Patent and Trademark Office issued Hutzler U.S. Patent No. D538,114 (the "'114 Patent"), a design patent covering the "ornamental design for an onion container." (Id. ¶ 11) On May 19, 2009, the Patent and Trademark Office issued Hutzler U.S. Patent No. D592,463 (the "'463 Patent"), a design patent protecting the "ornamental design for a container" designed to hold garlic. (Id. ¶ 13)

Hutzler alleges that Defendant Bradshaw "misappropriated the design patents for the Onion Saver and the Garlic Saver," and has sold, and currently is offering for sale, products that infringe the '114 Patent and the '463 Patent. (Id. ¶¶ 18-19)

Hutzler introduced its Food Saver Line in 2005, and sales have grown steadily since that time. These products now account for 63 percent of Hutzler's sales. (Id. ¶¶ 9-10, 30) Since Bradshaw introduced its competing products in 2011, however, Hutzler's sales have declined by 21 percent. (Id. ¶ 31)

On October 13, 2011, Hutzler filed a complaint alleging infringement of both the '114 Patent and the '463 Patent in violation of 35 U.S.C. §§ 271(a) and (b), as well as tortious interference with business and unfair competition under New York law. (Dkt. No. 1)

On October 20, 2011, Hutzler moved for a preliminary injunction enjoining Bradshaw from: (1) infringing, or inducing infringement of, Hutzler's patents; and (2) unfairly competing with Hutzler's line of produce containers. (Dkt. No. 4) Bradshaw argues that Hutzler's motion should be denied because it has not demonstrated (1) a likelihood of success on either its patent infringement or unfair competition claims, or (2) that it will suffer irreparable harm in the absence of an injunction. (Def. Opp. Br. 1) The Court held a hearing on Hutzler's application on January 19, 2012.

## DISCUSSION

## I.   PRELIMINARY INJUNCTION STANDARD

"The factors the trial court considers when determining whether to grant a preliminary injunction are of longstanding and universal applicability," Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375 (Fed. Cir. 2009), and may be summarized as follows:

> First . . . a court may issue a preliminary injunction . . . only if the plaintiff has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently

2

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." Second, the court may issue the injunction only if the plaintiff has demonstrated "that he is likely to suffer irreparable injury in the absence of an injunction." The court must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm (unless such a "departure from the long tradition of equity practice" was intended by Congress). Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor. Finally, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction.

Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citations omitted). In the context

of patent litigation, a "patentee's entitlement to [a preliminary] injunction is a matter largely

within the discretion of the trial court." Titan Tire, 566 F.3d at 1375 (citing Genentech, Inc. v.

Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

## II.   LIKELIHOOD OF SUCCESS

### A.   Patent Infringement Claim

To establish a likelihood of success on the merits of a patent infringement claim,

"the patentee seeking a preliminary injunction . . . must show that it will likely prove

infringement, and that it will likely withstand challenges, if any, to the validity of the patent."

Titan Tire, 566 F.3d at 1376 (citing Genentech, 108 F.3d at 1364).

#### 1.   Patent Validity

##### a.   Standards and Burden of Proof

"[W]hen the question of validity arises at the preliminary injunction stage . . . the

patent enjoys the same presumption of validity . . . as at other stages of litigation." Titan Tire,

566 F.3d at 1377 (citing Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088

3

(Fed. Cir. 1998)). Where, as here, "the alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." Id. "The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." Id.

"While the evidentiary burdens at the preliminary injunction stage track the burdens at trial, importantly the ultimate question before the trial court is different":

> Instead of the alleged infringer having to persuade the trial court that the patent is invalid, at this stage it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue.

Id. at 1377; see also Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1359 (Fed. Cir. 2001) (The party seeking a preliminary injunction "need not establish the validity of a patent beyond question," but rather must "present a clear case supporting the validity of the patent in suit.") (citing Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985); Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991)) (internal citations omitted). "If the alleged infringer raises a 'substantial question' regarding invalidity, i.e., asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." Entegris, Inc. v. Pall Corp., 490 F.3d 1340, 1351 (Fed. Cir. 2007) (quoting Genentech, 108 F.3d at 1364); see also Amazon.com, 239 F.3d at 1359 ("In resisting a preliminary injunction . . . one need not make out a case of actual invalidity. . . . The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself.")

4

b.    **Nature of a Design Patent**

The '114 and '463 Patents at issue in this litigation are design patents.[1] "A design patent is directed to the appearance of an article of manufacture." L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1123 (Fed. Cir. 1993) (citations omitted). Accordingly, a "design patent, unlike a utility patent, limits protection to the ornamental design of the article." Richardson v. Stanley Works, Inc., 597 F.3d 1288, 1293 (Fed. Cir. 2010) (citing Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1188 (Fed. Cir.1988) (citing 35 U.S.C. § 171)). "If the patented design is primarily functional rather than ornamental, the patent is invalid." Id. at 1293-94. "However, when the design also contains ornamental aspects, it is entitled to a design patent whose scope is limited to those aspects alone and does not extend to any functional elements of the claimed article." Id. at 1294 (citing L.A. Gear, 988 F.2d at 1123 ("The elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent.")).

"An article of manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed to be functional, when the appearance of the claimed design is 'dictated by' the use or purpose of the article." L.A. Gear, 988 F.2d at 1123 (citations omitted). "If the particular design is essential to the use of the article, it [cannot] be the subject of a design patent." Id. Stated another way, "[i]f the design of a particular feature must appear a certain way, and only that way, in order to perform a particular function, then the feature is functional and not ornamental." Etna Prods. Co. v. Q Mktg. Group, Ltd., No. 03 Civ. 3805(SAS), 2004 U.S. Dist. LEXIS 15323, at *22 (S.D.N.Y. Aug. 4, 2004) (citation omitted). Conversely,

---

[1]  Title 35, U.S.C. § 171 provides in pertinent part that "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 171.

"'[w]hen there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental [as opposed to functional] purpose.'" Rockport Co., Inc. v. Deer Stags, Inc., 65 F. Supp. 2d 189, 194 n.3 (S.D.N.Y. 1999) (quoting L.A. Gear, 988 F.2d at 1123).

### c.    Bradshaw's Invalidity Argument

Here, Bradshaw argues that Hutzler's patents are invalid because their "ornamental feature or design is 'merely a by-product' of functional and mechanical considerations dictating the design. . . . The shape is dictated by the shape of the produce that is intended to be stored inside." (Def. Opp. Br. 18) Bradshaw maintains that "[i]n order for an onion container to be an onion container or a garlic container to be a garlic container, it should have the general size and shape of an onion or a piece of garlic." (Id. at 16) Bradshaw further argues that in designing the Onion Saver and the Garlic Saver, Hutzler sought "to make the product immediately convey to the consumer what the item does. . . . [T]hat is the definition of functional, because it . . . immediately tells the customer something about the product: . . . what it is used for." (Jan. 19, 2012 Tr. 15-16)

The Court concludes that Bradshaw's argument that Hutzler's patented designs are primarily functional does not "raise[] a 'substantial question' regarding invalidity." Entegris, Inc., 490 F.3d at 1351. In reaching this conclusion, the Court has considered, inter alia, a variety of alternative designs demonstrating that produce preservers come in a variety of shapes and sizes.

The Federal Circuit has noted that "[c]onsideration of alternative designs . . . is a useful tool that may allow a court to conclude that a challenged design is not invalid for

functionality."[2]    Berry Sterling Corp. v. Pescor Plastics, Inc., 122 F.3d 1452, 1456 (Fed. Cir.

1997). At the preliminary injunction hearing, Hutzler produced numerous examples of products

used to store onion and garlic that do not have the same shape or general design as Hutzler's

patented designs.    (See Px 5-8) Bradshaw also submitted photographs of competing products

that do not share the design of Hutzler's products. (Megorden Aff., Ex. A, A[4], A[5]) Hutzler has

also offered evidence that it considered "numerous alternative designs" in designing its "Food

Saver Line," and found "no evidence that a specific design was best for storing produce."

(Ehrenhaus Decl. ¶ 4)

Bradshaw's argument that the shape of Hutzler's products conveys to the

consumer the type of produce that is intended to be stored inside does not demonstrate invalidity

on functionality grounds.  Assuming arguendo that Bradshaw's argument is relevant to the

analysis, food storage containers need not be in the shape of the produce that they are designed to

store in order for manufacturers to communicate to consumers the function of these products.

The function of these products may be, and commonly is, communicated through appropriate

labeling.  See, e.g., Px 7.

In sum, Bradshaw's functionality challenge to the validity of Hutzler's patents is

likely to fail.  Hutzler has demonstrated that the design of the Onion Saver and the Garlic Saver

is not "dictated by" the use or purpose of the article, and that onion and garlic may be stored and

preserved in products of myriad shapes and sizes.  Because Hutzler has established that there are

numerous ways to store and preserve onions and garlic and thus to achieve the function of the

---

[2] The Court noted that "[o]ther appropriate considerations might include:  whether the protected
design represents the best design; whether alternative designs would adversely affect the utility
of the specified article; whether there are any concomitant utility patents; whether the advertising
touts particular features of the design as having a specific utility; and whether there are any
elements in the design or an overall appearance clearly not dictated by function." Berry Sterling
Corp., 122 F.3d at 1456.

patented designs, "the design of the article[s] is more likely to serve a primarily ornamental [as opposed to functional] purpose." Rockport, 65 F. Supp. 2d at 194 n.3 (quoting L.A. Gear, 988 F.2d at 1123). Accordingly, Hutzler will likely prevail on the patent validity issue at trial.

### 2.     Infringement

#### a.     Claim Construction

"[D]etermining whether a design patent is infringed is a two-step process. First, the court must construe the design patent's claim." Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1286 (Fed. Cir. 2002). "In construing a design patent claim, the focus is on overall appearance and the visual impression it creates." Blumenthal Distrib., Inc. v. Exec. Chair, Inc., No. CV-10-1280(CBA), 2010 WL 5980151, at *5 (E.D.N.Y. Nov. 9, 2010) (citing OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997); Spotless Enters., Inc. v. A & E Prods. Group L.P., 294 F. Supp. 2d 322, 343-44 (E.D.N.Y. 2003)), report and recommendation adopted by 2011 WL 839546 (E.D.N.Y. Mar. 3, 2011). "'[W]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.'" Rockport, 65 F. Supp. 2d at 193 (quoting OddzOn, 122 F.3d at 1405 (citing Lee, 838 F.2d at 1188)).

Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) makes clear that, in construing design patents, district courts should generally forego verbal description:

> Given the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to "construe" a design patent claim by providing a detailed verbal description of the claimed design.

Id. at 679. "[D]esign patents 'typically are claimed as shown in drawings,' and . . . claim construction 'is adapted accordingly.'" Id. (quoting Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc., 501 F.3d 1314, 1319 (Fed. Cir. 2007)). "'[A]s a rule the illustration in the drawing

views is its own best description.'" Id. (quoting MANUAL OF PATENT EXAMINING PROCEDURE §

1503.01 (8th ed. 2006)).  Accordingly, "[d]istrict courts following Egyptian Goddess have

generally relied on patent drawings to construe design claims." Wing Shing Products (BVI) Co.

Ltd. v. Sunbeam Products, Inc., 665 F.Supp.2d 357, 360 (S.D.N.Y. 2009) (collecting cases).

   Here, the Court finds that "the claims articulated in each of the design patents at

issue are unambiguous and are clearly illustrated by the figures contained therein." Nike, Inc. v.

Meitac Int'l Enter. Co. Ltd., No. 06-CV-000934(PMP)(PAL), 2006 U.S. Dist. LEXIS 94662, at

*6 (D. Nev. Oct. 10, 2006).  In accordance with Egyptian Goddess, 543 F.3d at 679, this Court

will not provide a detailed verbal description of the '114 and '463 Patents and will rely instead

on the illustrations set out in the patents.  The Court construes Hutzler's claims as the ornamental

design for an onion container as shown in figures 1 through 3 of the '114 Patent, and the

ornamental design for a garlic container as shown in figures 1 through 8 of the '463 Patent. See,

e.g., Wing Shing, 665 F. Supp. 2d at 360 ("[t]his Court . . . construes [plaintiff's] claim as the

ornamental design for a coffeemaker, as shown in figures 1 through 7 of the '585 patent"); HR

U.S. LLC v. Mizco Internat'l, Inc., No. CV-07-2394(DGT)(JO), 2009 WL 890550, at *9

(E.D.N.Y. Mar. 31, 2009) ("a detailed verbal description of the '250 patent is unnecessary; it is

appropriate to 'rely upon the illustrations set out in the [patent], as they better represent the

claimed design'") (quoting Arc'teryx Equip., Inc. v. Westcomb Outerwear, Inc., No. 07-cv-

59(TS), 2008 WL 4838141, at *2 (D. Utah Nov. 4, 2008)).

     **b.**  **Ordinary Observer Test**

   The second step in determining whether a design patent is infringed requires the

fact-finder to "compare the patented and accused designs to determine whether the accused

design is substantially similar in appearance to the patented design." Rockport, 65 F. Supp. 2d at

193. In making that determination, courts utilize the "ordinary observer" test:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser
> usually gives, two designs are substantially the same, if the resemblance is such as
> to deceive such an observer, inducing him to purchase one supposing it to be the
> other, the first one patented is infringed by the other.

Egyptian Goddess, 543 F.3d at 670 (quoting Gorham Co. v. White, 81 U.S. 511, 528 (1871)); see

also L.A. Gear, 988 F.2d at 1124 ("Design patent infringement requires a showing that the

accused design is substantially the same as the claimed design. The criterion is deception of the

ordinary observer, such that one design would be confused with the other."); Crocs, Inc. v. Int'l

Trade Comm'n, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (infringement is demonstrated where "an

ordinary observer . . . would be deceived into believing that the accused product is the same as

the patented design") (citing Egyptian Goddess, 543 F.3d at 681).

   The "ordinary observer" test is more easily stated than applied. Is the "ordinary

observer" someone encountering the product or products for the first time, or someone who is

generally familiar with products of the sort in question? How should courts determine the

amount of "attention . . . a purchaser usually gives"? In determining whether "two designs are

substantially the same," should courts conduct a side-by-side comparison? How similar must

designs be to support a finding of infringement? What weight should be given to the color, size,

or material used in the products? The Court considers these and other questions below.

### (i)   Who is the "Ordinary Observer"?

   The case law makes clear that the "ordinary observer" is not an expert in the field.

As the Supreme Court said in Gorham, "[e]xperts . . . are not the persons to be deceived."

Gorham, 81 U.S. at 528. The "ordinary observer" is likewise not a patent lawyer "who inspects

the designs critically to highlight each and every perceivable difference between them." Durdin

v. Kuryakyn Holdings, Inc., 440 F. Supp. 2d 921, 933-34 (W.D. Wis. 2006); see also Tappan Co. v. Gen. Motors Corp., 248 F. Supp. 978, 980 (N.D. Ohio 1965) ("The Supreme Court has said [in Gorham] that sameness of effect upon the eye is the main test of substantial identity of design, but it is not essential that the appearance should be the same to the eye of the expert. It is sufficient if it is the same to the ordinary observer.").

The notional "ordinary observer" is, instead, someone who – while not an expert in the product – is not entirely ignorant of it, and indeed has some degree of familiarity with it. The "ordinary observer" thus includes someone who has purchased, or shopped for, a like item in the past. See, e.g., Henry Hanger & Display Fixture Corp. of Am. v. Sel-O-Rak Corp., 270 F.2d 635, 641 (5th Cir. 1959) ("'[T]he ordinary purchaser of revolving racks, who was acquainted with the patented design would, upon viewing any of defendants' racks, including the wrought iron rack, . . . assume that he was viewing an identical or slightly modified version of the patented design.'") (quoting Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp. of Am., 159 F. Supp. 769, 773 (S.D. Fla. 1958)); Applied Arts Corp. v. Grand Rapids Metalcraft Corp., 67 F.2d 428, 430 (6th Cir. 1933) ("[T]he ordinary observer is not any observer, but one who, with less than the trained faculties of the expert, is 'a purchaser of things of similar design,' or 'one interested in the subject.'"); Graff, Washbourne & Dunn v. Webster, 195 F. 522, 524 (2d Cir. 1912) ("Having seen the complainant's design in a show case or shop window, the ordinary buyer would be very likely to mistake the defendants' design for it, if seen in a similar environment. This is the real test of infringement of design patents. If the ordinary buyer, having seen one of the complainant's dishes and wishing to procure one like it, would be induced to buy one of the defendants' dishes instead, it is enough."); Minka Lighting, Inc. v. Maxim Lighting Int'l, Inc., No. Civ. A. 3:06-CV-995-K, 2009 WL 691594 (N.D. Tex. Mar. 16, 2009)

("The ordinary observer is therefore a member of the public who is currently shopping for or has recently purchased lighting fixtures – indeed, a 'purchaser of things of similar design.'"); Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc., 424 F. Supp. 2d 1188, 1196 (C.D. Cal. 2006) ("[The ordinary] observer is not a person who has never seen the type of item the patent describes, 'but one who, though not an expert, has reasonable familiarity with such objects, and is capable of forming a reasonable judgment when confronted with a design therefor as to whether it presents to his eye distinctiveness from or similarity with those which have preceded it.'") (quoting Applied Arts, 67 F.2d at 430).

Accordingly, the "ordinary observer" here is someone who has seen, shopped for, or purchased food storage items of similar design.

### ii.   Attention

Under the Gorham test, a court must compare the patented and accused designs "giving such attention as a purchaser usually gives." Gorham, 81 U.S. at 528.

Gorham makes clear that "such attention as a purchaser usually gives" does not include the attention that a purchaser would give the products if asked to conduct a "critical examination" of them, or after being told that there may be differences between them. Id. at 529-30 (determination whether ordinary purchaser would regard products as substantially the same does not turn on whether "some diversities in [the product] . . . are discoverable when attention is called to them," whether differences become apparent "when stimulated by a suspicion that there may be diversity," or whether differences become apparent when "critical examination" is brought to bear that would not typically be employed by an ordinary purchaser).

In considering the degree of attention a typical consumer is likely to bring to a purchase, it is reasonable to assume that consumers will bring greater attention to an expensive

purchase, and give less attention where the cost is inconsequential. See Braun, Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 820, 820 n.9 (Fed. Cir. 1992) (relying on trial testimony that "consumers typically purchase hand held electric [blenders] on an 'impulse' and as a result they may not differentiate [between] designs," particularly where the products "are relatively inexpensive"); Cardiac Pacemakers, Inc. v. Coratomic, Inc., 535 F. Supp. 280, 286 (D. Minn. 1982) ("The test for design patent infringement is whether an ordinary purchaser would be induced to purchase a product supposing it to be another. . . . Pacers are expensive and generally are sold to physicians who specialize in pacer implants. . . . [The accused infringer's] pacers are sufficiently different from [the patentee's] pacer so that the ordinary consumer would not be misled.") (emphasis added); Superior Merchandise Co., Inc. v. MGI Wholesale, Inc., Nos. Civ. A. 98-3174, Civ. A. 99-3492, 2000 WL 322779, at *11 (E.D. La. Mar. 27, 2000) ("Whether undertaking a desperate search to purchase the bodacious bead for its novel appearance, or encountering the breast bead upon first impression while browsing a bead vendor's wears, the ordinary purchaser is likely to see, quite simply, a three-dimensional simulation of well-endowed bare human female breasts. In addition, considering the amount of attention that is likely to be given during an impulse purchase of the bodacious beads, it must be concluded that the two designs are substantially the same.").

Given that the products at issue here are inexpensive – ranging in price from $2.00 to $4.00 (Jan. 19, 2012 Tr. 10, 26) – and thus likely to be purchased on impulse, the Court concludes that the ordinary purchaser is not likely to give significant attention to the products when purchasing them.

13

### iii.   "Substantially the Same"

"Design patent infringement requires a showing that the accused design is substantially the same as the claimed design.  The criterion is deception of the ordinary observer, such that one design would be confused with the other."  L.A. Gear, 988 F.2d at 1124; see also Crocs, 598 F.3d at 1303 (infringement is demonstrated where "an ordinary observer . . . would be deceived into believing that the accused product is the same as the patented design").  "In conducting such analysis the patented design is viewed in its entirety, as it is claimed. . . . [T]he ultimate question requires determining whether "'the effect of the whole design [is] substantially the same.'"  L.A. Gear, 988 F.2d at 1125 (quoting Gorham, 81 U.S. at 530).

### (a)   Focus on "Overall Visual Appearance"

In determining whether two designs are "substantially the same," courts focus on the overall impression given by the claimed design, rather than particular ornamental details or minutiae.  See, e.g., Crocs, 598 F.3d at 1303 ("'[T]he deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation.' . . . The ordinary observer test applies to the patented design in its entirety, as it is claimed.") (quoting Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1371 (Fed. Cir. 2002)); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("What is controlling is the appearance of the design as a whole in comparison to the accused product."); OddzOn, 122 F.3d at 1405 ("[I]t is the appearance of a design as a whole which is controlling in determining infringement.  There can be no infringement based on the similarity of specific features if the overall appearance of the designs are dissimilar. . . ."); Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995) ("Under Gorham, the focus is on the overall ornamental appearance of the claimed design, not selected ornamental features.") (emphasis in

14

original); Payless Shoesource, Inc. v. Reebok Int'l, Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993)

("'[M]inor differences between a patented design and an accused article's design cannot, and

shall not, prevent a finding of infringement.' Here, the district court's infringement analysis

clearly evidences a focus on a single difference as opposed to the entirety of the patented design.

Thus, the district court erred by failing to 'consider the ornamental aspects of the design as a

whole and not merely isolated portions of the patented design.'") (citations omitted); HR U.S.

LLC, 2009 WL 890550, at *12 ("It is improper to focus on specific features that differ between

two designs if such a focus ignores the critical issue of whether the overall designs, as a whole,

are substantially similar.") (citing Amini Innovation, 439 F.3d at 1372); see also Decade Indus.

v. Wood Tech., Inc., 100 F. Supp. 2d 979 (D. Minn. 2000) ("While Wood has tweaked some of

the angles and proportions of the Sanus design and has inserted additional shelves between the

upright legs, these minor changes do not materially alter the substantial visual likeness of the two

designs when they are viewed in their entirety.").

        Consistent with this approach, courts give significant attention to the lines and

overall shape of the designs at issue. See, e.g., Crocs, 598 F.3d at 1306 ("One of the overall

effects of the design is the interaction between the strap assembly portion and the base portion of

the shoes where the strap is attached to the base. Multiple major design lines and curves

converge at that point creating a focal point attracting the eye of the ordinary observer when

viewing the overall effect of the design. Another overall effect of the design is a visual theme of

rounded curves and ellipses throughout the design, including the strap forming a sort of

continuation of the sidewall of the base to create a visually continuous ring encircling the entire

shoe."); Richardson, 597 F.3d at 1296 ("[T]he two designs are indeed different. Each of the

Fubar tools has a streamlined visual theme that runs throughout the design including elements

such as a tapered hammer-head, a streamlined crow-bar, a triangular neck with rounded surfaces, and a smoothly contoured handle. In a side-by-side comparison with the '167 patent design, the overall effect of this streamlined theme makes the Fubar tools significantly different from Richardson's design. Overall, the accused products clearly have a more rounded appearance and fewer blunt edges than the patented design."); Braun, 975 F.2d at 820 (finding infringement despite the "readily noticeable difference" between the patented blender and the accused blender in that "[Braun's blender] has a handgrip indentation while the latter does not"; noting that "both Waring's blender and Braun's blender share a fluid, ornamental, aerodynamic overall design. The shafts of both blenders are encased in a housing that gradually tapers away from the motor housing. The top portion of each blender, when viewed from the front, is tapered at the top to integrate the handle into the motor housing. The shaft housing of each blender gradually expands to form a blade housing, which is punctured by four elongated, essentially rectangular ports"); see also Unique Functional Prods., Inc. v. Mastercraft Boat Co., Inc., 82 F. App'x 683, 689 (Fed. Cir. 2003) ("[T]he Reliable coupler has a rounded nose . . . whereas, as previously illustrated, the '777 patent requires a boxy and blunt nose. Second, the Reliable coupler's nose . . . slopes sharply downwardly, rather than having a substantially square or block-shaped face as required by the '777 patent."); Moore v. Stewart, 600 F. Supp. 655, 664 (D. Ark. 1985) ("In the court's view the appearances of the Moore and the Stewart whistles are substantially identical despite the previously noted variations. The Stewart whistle even as modified retains the general shape, configuration, and dimensions of the Moore design; any differences in appearance, though discernible upon close examination, are not likely to be quickly perceived by an ordinary observer paying the degree of attention a purchaser would."); Duncan & Miller Glass Co. v. Hazel Atlas Glass Co., 47 F. Supp. 192, 195 (D. Va. 1942) ("The outside, or contour, is a very

16

important factor in making up the general, or over-all impression to the average purchaser. Defendant's ash tray has a stem while the design patent has no stem. The stem is of prime importance and is one of the first differences to strike the eye of the ordinary observer.")

Accordingly, in considering whether the designs at issue here are "substantially the same," this Court's focus will be on the overall impression given by the claimed designs, rather than on particular ornamental details or minutiae.

### (b)     Propriety of Side-by-Side Comparison

The case law is not entirely consistent as to whether side-by-side comparison of the patented and allegedly infringing products is appropriate. Some early decisions counseled against such an approach. See Sanson Hosiery Mills, Inc. v. S.H. Kress & Co., 109 F. Supp. 383, 384 (D.N.C. 1952) ("Actual comparison for minute inspection is not a fair test. The imitation may be on display when the patented article is not present. . . . A design patent protects the general design, the pictured effect on the mind from a general view, rather than details revealed by a minute test. Therefore, testimony of a comparison test is not exclusive nor conclusive."); Try-Me Beverage & Compound Co. v. Metropole, 25 F.2d 138, 141 (D.S.C. 1928) ("'It may also be assumed . . . that side by side comparison in court is not a proper test. . . .'") (quoting Coca-Cola Co. v. Whistle Co. of Am., 20 F.2d 955, 956 (D. Del. 1927)); Friedberger-Aaron Mfg. Co. v. Chapin, 151 F. 264, 265 (C.C.Pa. 1907) (finding infringement even though it was "very easy to distinguish between the two designs when brought together"). There is clearly some tension between the "ordinary observer" test – which does not contemplate an opportunity to conduct a detailed comparative analysis of the two products at issue – and a side-by-side comparison by the Court.

The Federal Circuit has, however, regularly engaged in side-by-side comparisons of patented and accused designs in order to determine whether they are "substantially the same." See, e.g., Richardson, 597 F.3d at 1296 ("In a side-by-side comparison with the '167 patent design, the overall effect of this streamlined theme makes the Fubar tools significantly different from Richardson's design."); Crocs, 598 F.3d at 1304 ("The proper comparison requires a side-by-side view of the drawings of the '789 patent design and the accused products."); Arminak & Assocs., 501 F.3d at 1327 ("Calmar also implies that it was improper for the district court to do a detailed side-by-side comparison between the patented design and the accused design. Calmar cites no authority for this contention because there is none. To establish infringement in a design patent case, the district court is required to compare the patented design with the accused design. Without comparing the patented design with the accused design, there was no way for the district court to determine whether an ordinary observer would find the accused design deceptively similar. . . ."), abrogated on other grounds by Egyptian Goddess, 543 F.3d 665.

A long line of cases counsels that, in performing a side-by-side comparison, courts generally should compare the design set forth in the patent – that is, the drawings – with the accused product, rather than comparing the embodiment of the patented design and the accused product. See Payless Shoesource, 998 F.2d at 990 ("Proper application of the Gorham test requires that an accused design be compared to the claimed design, not to a commercial embodiment."); see also Richardson, 597 F.3d at 1294 ("We also reject Richardson's argument that the court did not include drawings from the patent in its claim construction. Richardson argues that it is the ordinary observer's perception of those drawings that is the controlling consideration under the Supreme Court's opinion in [Gorham]. We agree with Richardson on the decisive importance of drawings in a design patent."); Amini Innovation, 439 F.3d at 1370-

18

71 ("'A design patent protects the non-functional aspects of an ornamental design as seen as a whole and <u>as shown in the patent</u>. . . . It is the drawings in the patent, not just one feature of the claimed design, that define the patented design.'") (quoting <u>KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.</u>, 997 F.2d 1444, 1450 (Fed. Cir. 1993)) (emphasis added); <u>Elmer</u>, 67 F.3d at 1578 ("Under <u>Gorham</u>, the focus is on the <u>overall</u> ornamental appearance of the claimed design, not selected ornamental features.  The overall ornamental appearance of the '620 design, <u>as shown in the patent drawings</u>, is too different from ICC's design for an ordinary observer to be induced into purchasing ICC's product thinking it was HTH's design.") (first emphasis in original; second emphasis added); <u>Rockport</u>, 65 F. Supp. 2d at 192-93 ("A design patent's claim is limited to what is shown in the application drawings. . . . The test for infringement does not compare the commercial embodiments of the two products.  Rather, the allegedly infringing product is compared only to the patented design.").

However, "[w]hen no significant distinction in design has been shown between the patent drawing and its physical embodiment, [the Federal Circuit has stated that] it is not error . . . to compare the embodiment of the patented design with the accused devices." <u>Lee</u>, 838 F.2d at 1189; <u>see</u> <u>also</u> <u>L.A. Gear</u>, 988 F.2d at 1125-26 ("[w]hen the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly   . . . ; indeed, such comparison may facilitate application of the <u>Gorham</u> criterion of whether an ordinary purchaser would be deceived into thinking that one were the other") (citing <u>Lee</u>, 838 F.2d at 1189).

Because the Court concludes that the design of the Hutzler products and their commercial embodiments are substantially the same, the Court has considered the drawings set forth in Hutzler's patents as well as the parties' products.

(c)     **Degree of Similarity**
**Necessary to Find Infringement**

"[P]atent infringement can be found for a design that is not identical to the patented design." Braun, 975 F.2d at 820; see also Rockport, 65 F. Supp. 2d at 193 ("The accused design does not have to be identical to the patented design for infringement to be found."); HR U.S. LLC, 2009 WL 890550, at *10 ("[t]he patented and accused designs . . . need not be identical in order for design patent infringement to be found") (citing Egyptian Goddess, 543 F.3d at 678 (explaining that under the ordinary observer test infringement may be found where the accused article "'embod[ies] the patented design or any colorable imitation thereof'")); Metrokane, Inc. v. Wine Enthusiast, 185 F. Supp. 2d 321, 329 (S.D.N.Y. 2002) ("A design need not be identical to the patented design for infringement to occur."); Nike, 2006 U.S. Dist. LEXIS 94662, at *4 ("In assessing infringement, the patented and accused designs do not have to be identical in order for design patent infringement to be found."). "'[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement.'" Crocs, 598 F.3d at 1303 (quoting Payless Shoesource, 998 F.2d at 991).

In practice, however, the cases in which the Federal Circuit has sustained a finding of infringement have involved a very high degree of similarity. See, e.g., Crocs, 598 F.3d at 1306 ("In one [side-by-side] comparison after another, the shoes appear nearly identical. If the claimed design and the accused designs were arrayed in matching colors and mixed up randomly, this court is not confident that an ordinary observer could properly restore them to their original order without very careful and prolonged effort."); L.A. Gear, 988 F.2d at 1125-26 (affirming district court's holding of design patent infringement where "[t]he district court found that the designs of four models of [defendant's] accused shoes were 'almost a direct copy' of the '081 design"); Lee, 838 F.2d at 1190 ("While we agree with Lee that infringement can be found

20

for designs that are not identical to the patented design, such designs must be equivalent in their ornamental, not functional, aspects. The accused devices must meet the Gorham test of similarity of ornamental appearance such that an ordinary observer would be likely to purchase one thinking it was the other.").

### (d)   Relevance of Color, Size, and Material

Where – as here – the design patent is not limited to a particular size, color, or construction material, such factors should not be taken into consideration in performing an infringement analysis. See Lee, 838 F.2d at 1189 ("Lee also points to the court's observation that the tennis balls used in the physical model of the Lee design were colored, arguing that color has no role in design patent infringement and that the court may have been improperly influenced by the color differences of the accused structures. . . . The record does not support Lee's view that the district court's reference to the colored tennis balls means that the court's decision turned on the color differences. The court is presumed to have applied the law correctly, absent a clear showing to the contrary."); Herbko Int'l, Inc. v. Gemmy Industries Corp., 916 F. Supp. 322, 326 (S.D.N.Y. 1996) ("If an ordinary consumer were to be deceived, the deception would result from shared features of the products that are not protected by the design patent: (1) features that are not included in Herbko's patent, such as the color, size and material (plastic) of the two products. . . ."); Superior Merch., 2000 WL 322779, at *11 ("Unclaimed features are irrelevant; color, size and construction material cannot be the basis of similarity where these features of the commercial embodiment are beyond those described in the patent claim."); Physio-Control Corp. v. Medical Research Labs., No. 85 C 4973, 1988 WL 5023, at *1 (N.D. Ill. Jan. 15, 1988) ("'A determination of the infringement issue is somewhat of an existential exercise. It is not enough to say that no one would confuse the two designs

21

because one is red and the other is green and both have prominently displayed logos. The test is not palming off; color and designations are not part of the patented design and must be ignored."); see also Unique Functional Prods., 82 F. App'x at 690 ("[T]he '777 patent is not limited to any particular size or color. We conclude, therefore, that the court erred by taking those features into consideration in its infringement analysis. . . .").

Accordingly, this Court will not consider the size, color, sheen, or construction material of the products, as these features are not claimed in Hutzler's design patents.

### c.    Bradshaw's Arguments on Similarity

Bradshaw maintains that "the designs of the '114 and '463 Patents . . . and the accused Bradshaw products would not be considered 'substantially the same' to an ordinary observer." (Def. Opp. Br. 7) With respect to the '114 Patent, Bradshaw points out that the top view of the patented design, illustrated in Figure 1, shows that "the outside circumference of [Hutzler's] onion container is a perfect circle," while the "outside circumference of the Bradshaw onion keeper is not a perfect circle, but has a scalloped edge in top view." (Id. at 8) Bradshaw further notes that Hutzler's "onion container includes a surface texture that looks like the skin of an onion and is solid, not transparent," while "in the Bradshaw onion keeper, the top view clearly shows that the material is transparent, not solid . . . and does not resemble an onion at all." (Id.) Bradshaw further observes that the surface texture of the Hutzler design is "uneven and arbitrary, but includes generally radially extending lines in the top view that converge at a center of the circular onion container" and "includes a very narrow top or tip surface." (Id.) Bradshaw argues that, in contrast, its product "has a smooth surface, except for the twelve (12) very distinctive, radially extending indentations" and "has a very wide top or tip surface, which . . . is not a perfect circle, having a scalloped edge. . . ." (Id.)

In comparing Figure 2 of the '114 Patent (a side view) with the side view of

Bradshaw's product, Bradshaw notes that while the "surface texture above the separation and

below the separation [of the patented design] is generally continuous, and the material is clearly

solid, not transparent," the "Bradshaw onion keeper above the separation is transparent, whereas

the bottom below the separation is solid." (Id. at 9)  Bradshaw argues that this two-toned

appearance provides "a very different 'look' to the Bradshaw onion keeper." (Id.)  Bradshaw

further asserts that the

> numerous vertical lines in the design of the '114 Patent provide a completely
> different overall appearance to the onion container when compared to the
> Bradshaw onion keeper. . . . Since the Bradshaw onion keeper does not include
> these numerous vertical lines, which provide the appearance of the skin of an
> onion, the overall appearance of the Bradshaw onion keeper is not the same as the
> overall appearance of the '114 Patent.

(Id. at 9-10)

In comparing Figure 3 of the '114 Patent (a bottom view) with the bottom view of

Bradshaw's onion keeper, Bradshaw notes that "Figure 3 . . . appears to include a gradually

curving surface from the sides to the bottom, until the bottom center ultimately becomes flat. . . .

[T]here is no clear line of demarcation between the side walls and the bottom wall. . . ." (Id. at

10)  The bottom of Bradshaw's onion keeper has a "ridge formed at a spaced location from the

center of the onion keeper . . . formed from a recessed bottom . . . [and] there is a narrow portion

outside of the ridge, which is flat, and then gradually curves into the side walls." (Id.)

Bradshaw makes similar arguments concerning the differences between the '463

Patent and Bradshaw's garlic keeper.[3]

---

[3] Bradshaw notes, inter alia, that the '463 design has a surface texture that is not transparent and
looks like the skin of a piece of garlic and that the tip of the design is a perfect circle. (Def. Opp.
Br. 11)  By contrast, Bradshaw argues, its garlic container is transparent on the top, its surface
texture does not resemble a piece of garlic, and the tip of its product has a scalloped edge. (Id. at

### d.   Analysis

The '114 Patent claims "[t]he ornamental design for an onion container, as shown and described," while the '463 Patent claims "[t]he ornamental design for a garlic container, as shown and described." The claims extend to the overall design of the onion and garlic containers – including the shape and proportions of the products and the horizontal line across the middle of the onion container and two-thirds of the way down the garlic container.

As noted above, "patent infringement can be found for a design that is not identical to the patented design." Braun, 975 F.2d at 820; HR U.S. LLC, 2009 WL 890550, at *10; Metrokane, Inc., 185 F. Supp. 2d at 329; Nike, 2006 U.S. Dist. LEXIS 94662, at *4. "[I]n the 'ordinary observer' analysis, the patented design is viewed in its entirety, as it is claimed," Contessa Food Prods., 282 F.3d at 1378, and "[i]t is improper to focus on specific features that differ between two designs if such a focus ignores the critical issue of whether the overall designs, as a whole, are substantially similar." HR U.S. LLC, 2009 WL 890550, at *12 (citing Amini Innovation, 439 F.3d at 1372). "[T]he concentration on small differences in isolation distract[s] from the overall impression of the claimed ornamental features." Crocs, 598 F.3d at 1303-04. "It is the drawings in the patent, not just one feature of the claimed design, that define the patented design." Amini Innovation, 439 F.3d at 1371 (citing KeyStone, 997 F.2d at 1450).

Bradshaw's arguments regarding the differences between the containers focus too narrowly on the details of their ornamentation, rather than considering the overall look of the design. The Federal Circuit has made clear that it is error for a trial court to focus on "each

---

12) Bradshaw maintains that "the dramatic difference between the top and bottom portions of the Bradshaw garlic keeper provides a two-toned appearance to the Bradshaw garlic keeper, which does not [– unlike the Hutzler product –] have the appearance of the skin of a piece of garlic." (Id. at 13)

[design] element separately instead of analyzing the design as a whole from the perspective of an ordinary observer." Amini Innovation, 439 F.3d at 1372.

In L.A. Gear, the manufacturer of the accused design pointed out differences between features of its shoes and the design of the patentee. L.A. Gear, 988 F.2d at 1126. Despite these differences, the Federal Circuit affirmed the district court's finding "that 'the placement of all the major design elements is the same, creating the same distinctive overall look,' and . . . that the four infringing models were confusingly similar to the patented design, as viewed by the ordinary observer." Id.

Similarly, in Rockport, the Court noted that there were differences between the patented shoe design and the accused product: "First, the mud guard of the [accused product] is broken into several parts instead of the . . . patent's one-piece mud guard. . . . The second difference is that the [accused shoe] does not have the double layer of shoe extending from the bottom of the eyestay to between the second and third eyelets." Rockport, 65 F. Supp. 2d at 195. Nevertheless, the court found infringement, noting that "'[u]nder Gorham, the focus is on the overall ornamental appearance of the claimed design, not selected ornamental features.'" Id. (quoting Elmer, 67 F.3d at 1577).

Here, while the Court acknowledges that there are differences between the patented designs and Bradshaw's products, "[a] visual comparison of the . . . design patent[s] with [Bradshaw's Onion and Garlic Keepers] reveals that the overall look of the [products] is extremely similar . . . [and] [a]lthough a highly discerning consumer might notice the differences if the [products] were placed side by side, the strength of the [products'] common features greatly outweighs their differences." Jack Schwartz Shoes, Inc. v. Skechers USA, Inc., 233 F. Supp. 2d 512, 514 (S.D.N.Y. 2002).

The patented designs and Bradshaw's products have the same shape – that of onion and garlic bulbs – in the same proportions. Given that the onion and garlic shapes are not "functional" characteristics – because, as noted above, onion and garlic can be and are stored in containers of myriad shapes and sizes – the Court must take into account the shapes and proportions of Hutzler's designs and Bradshaw's products.

The '114 Patent and Bradshaw's Onion Keeper likewise have (1) vertical striations running the length of the product; (2) striations that convene in a narrow "stem" at the top; and (3) a horizontal line running across the middle of the container where the products open. The '463 Patent and Bradshaw's Garlic Keeper both have (1) a horizontal line running across the container approximately two-thirds of the way down where the products open; (2) air slits on the bottom; and (3) raised designs of approximately the same size in the center of the interior of the bottom. Disregarding the color, sheen, and construction material differences – as this Court must do – "the accused products embody the overall effect of the ['114 and '463 designs] in sufficient detail and clarity to cause market confusion."[4] Crocs, 598 F.3d at 1306.

––––––––––

[4] As noted above, Bradshaw argues that its products are not similar to Hutzler's designs because they are "two-toned," with the top portion of the containers transparent. Bradshaw asserts that Hutzler's products are "solid, not transparent" (Def. Opp. Br. 8-9), and that the transparent aspect of its products gives them a "very different 'look.'" (Id. at 9)

As an initial matter, the top part of Bradshaw's Garlic Keeper is not transparent. It is, for the most part, opaque, except at its striations, which approach translucence. Moreover, to the extent that Bradshaw contends that this Court should attribute significance to the "two-toned" nature of its products, it contradicts the case law discussed above holding that color must be ignored where, as here, it is not part of the patented design.

Neither side has cited case law addressing whether it is appropriate for a court to consider transparency or translucency in performing an infringement analysis. While the Federal Circuit recently cited the Manual of Patent Examining Procedure § 1503.02 (8th ed. 2006) for the proposition that "[o]blique line shading must be used to show transparent, translucent and highly polished or reflective surfaces," see Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1331 (Fed. Cir. 2012), and neither the '114 Patent nor the '463 Patent utilizes oblique line

The Court's conclusions are buttressed by other aspects of the <u>Gorham</u> "ordinary observer" test.  Given how inexpensive these items are, a purchaser has little motive to pay attention to the subtle differences highlighted by Bradshaw.  Stripping away the color, sheen and construction material differences, a consumer who has seen Hutzler's design in a store, and later sees Bradshaw's products, is likely to purchase the latter believing it to be the former. Accordingly, Hutzler has established a likelihood of success on the merits of its patent infringement claim.

**B.    <u>Unfair Competition Claim</u>**

To succeed on an unfair competition claim under New York common law, "a plaintiff must demonstrate: 1) a likelihood of confusion; and 2) the defendant's bad faith." <u>New York City Triathlon, LLC v. NYC Triathlon Club, Inc.</u>, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (citing <u>Kraft Gen. Foods, Inc. v. Allied Old English, Inc.</u>, 831 F. Supp. 123, 135 (S.D.N.Y. 1993); <u>Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.</u>, 823 F. Supp. 1077, 1093 (S.D.N.Y. 1993)).  "'[T]he essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" <u>Blumenthal Distrib.</u>, 2010 WL 5980151, at *11 (quoting <u>Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.</u>, 58 F.3d 27, 34 (2d Cir. 1995) (quoting <u>Rosenfeld v. W.B. Saunders</u>, 728 F. Supp. 236, 249-50 (S.D.N.Y. 1990))); <u>see also</u> <u>Medtech Prods., Inc. v. Ranir, LLC</u>, 596 F. Supp. 2d 778, 816 (S.D.N.Y. 2008) ("[i]n order to

---

shading, the case law is not clear that the consequence of a failure to indicate on a design patent that the surface texture is translucent or transparent results in a design patent claim that is limited to opaque surfaces.  Even assuming <u>arguendo</u> that this is true, the Court finds that the transparency of the Bradshaw Onion Keeper, and the partial translucency of its Garlic Keeper, are not sufficient to vitiate the Court's finding that Bradshaw's products are substantially the same as Hutzler's designs, given the similarities discussed above and in light of the small degree of attention an ordinary purchaser is likely to give to these inexpensive products.

state a claim of unfair competition under New York law, a plaintiff must allege that the defendant 'misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so.'") (quoting <u>Abe's Rooms, Inc. v. Space Hunters, Inc.</u>, 38 A.D.3d 690, 692 (2d Dept. 2007)); <u>Towers Fin. Corp. v. Dun & Bradstreet, Inc.</u>, 803 F. Supp. 820, 823 (S.D.N.Y. 1992) ("to make out a claim of unfair competition under New York law, [plaintiff] must show that [defendant] . . . "misappropriat[ed] for the commercial advantage of one person . . . a benefit or "property" right belonging to another"") (quoting <u>Roy Export Co. v. Columbia Broad. Sys., Inc.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982)).

      "'Traditionally, unfair competition was limited to claims that one party had attempted to "pass off" his goods as those of another, to mislead the buying public into purchasing goods while thinking they were getting those of someone else.'" <u>Diversified Mktg., Inc. v. Estee Lauder, Inc.</u>, 705 F. Supp. 128, 131 (S.D.N.Y. 1988) (quoting <u>Ideal Toy Corp. v. Kenner Prods.</u>, 443 F. Supp. 291, 305 (S.D.N.Y. 1977) (citing <u>Flexitized, Inc. v. National Flexitized Corp.</u>, 335 F.2d 774, 781 (2d Cir. 1964))). "However, contemporary New York unfair competition law also encompasses a broader range of unfair practices generally described as the misappropriation of the skill, expenditures and labors of another." <u>Id.</u> (quoting <u>Ideal Toy</u>, 443 F. Supp. at 305 (citing <u>Flexitized</u>, 335 F.2d at 781)).

      Here, Hutzler contends that Bradshaw "has copied Hutzler's entire line of Food Saver Products, resulting in Bradshaw misappropriating. . . . labors, skills, expenditures, and goodwill that Hutzler accumulated while developing, marketing, and selling the Food Saver Line. . . . Knowing that the Hutzler Food Saver Line was successful, Bradshaw produced identical products." (Pltf. Br. 11-12) Hutzler further argues that given the "obvious" similarity between Hutzler's Food Saver Line and Bradshaw's Food Keeper Line, the fact that Hutzler and

Bradshaw are direct competitors, and the fact that Bradshaw "has taken no steps to differentiate itself from Hutzler in supermarkets, or in advertisements," the Court should find that it has demonstrated a likelihood of confusion. (Id. at 12)

Bradshaw maintains that "[c]onsumers are not likely to be confused as to the origin of product elements dictated by function." (Def. Opp. Br. 20) Bradshaw argues that "[i]n addition to the differences in the appearance of the products themselves, Bradshaw's labels, packaging and advertising bear no resemblance to those of Hutzler." (Id.) In arguing that Hutzler cannot establish bad faith on the part of Bradshaw, Bradshaw notes that it "took significant efforts to design products which do not infringe those patents" and that it obtained an opinion from its intellectual property counsel "and relied upon that opinion in proceeding with the marketing of the accused products." (Id.)

The Court concludes that Hutzler has demonstrated a likelihood of confusion. As noted above, Bradshaw's Onion and Garlic Keepers and Hutzler's designs are substantially the same. In addition to the onion and garlic containers, Bradshaw chose to produce containers for lemons, tomatoes and green peppers, thereby duplicating Hutzler's entire Food Saver Line. (Ehrenhaus Decl. ¶ 18; Px 9-14) All of the containers are essentially the same size, proportions, shape, and color. (Px 9-14) Hutzler and Bradshaw are direct competitors operating in the same market and vying for the same customers. Indeed, Hutzler has offered evidence that the two companies' products have been intermingled in supermarket displays, making it likely that customers will confuse the origin of the products. (Ehrenhaus Decl., Ex. D) In short, Hutzler has demonstrated that consumers are likely to be confused as to the origin of the products.

Hutzler has also demonstrated that it is likely to establish that Bradshaw has acted in bad faith. Having seen the success of Hutzler's Food Saver Line, which required a significant

expenditure of time and money on Hutzler's part (Hutzler Decl. ¶ 7), Bradshaw developed its own line of substantially similar containers – for the same five vegetables and fruits (Ehrenhaus Decl. ¶ 18) -- to be marketed to the same customers. Bradshaw acknowledges that it was aware of Hutzler's products when it developed its own competing line. (Megorden Aff. ¶ 5) Given that Bradshaw knew of Hutzler's products, its actions here must be viewed as deliberate and indicative of bad faith. Although Bradshaw maintains that it relied on an attorney's opinion in proceeding with the marketing of its products (Id. ¶ 6), Bradshaw has refused to provide that opinion to the Court. Because Bradshaw has refused to provide the attorney's opinion, the fact that it solicited advice from counsel is entitled to little weight. There is no way to know whether Bradshaw followed the advice of its attorney in launching its new product line.

In sum, the Court finds that Bradshaw has demonstrated a likelihood of success on its unfair competition claim.

## III.   PLAINTIFF'S SHOWING OF IRREPARABLE INJURY

Under the Salinger standard, a court "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress)." Salinger, 607 F.3d at 80 (quoting Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008); eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). Instead, "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." Salinger, 607 F.3d at 82.

Hutzler seeks an order

> preliminarily enjoining defendant Bradshaw . . . from: (1) infringing, or inducing
> infringement, of Hutzler's patents, and (2) unfairly competing with Hutzler's line
> of produce containers, specifically, from directly or indirectly making, using,
> selling or offering for sale any products embodying the inventions of the patents

30

during their terms or the Food Saver Line, or without the express written authority of Hutzler.

(Dkt. No. 4)

Hutzler argues that, absent an injunction, it will suffer six types of irreparable harm: (1) reputational harm; (2) decrease in market share and loss of market leader position; (3) price erosion; (4) loss of customers' goodwill; (5) adverse effects on sales momentum and profits; and (6) encouragement of other infringement. (Pltf. Br. 14-17). The Court finds that Hutzler will suffer irreparable harm – in the form of decreased market share, loss of its position as market leader, and price erosion – if an injunction is not issued.

"It is well-established that a movant's loss of current or future market share may constitute irreparable harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 67 (2d Cir. 2007) (citing Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114-15 (2d Cir. 2005); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 596 (3d Cir. 2002)); see also Stein Indus, Inc. v. Jarco Indus., Inc., 934 F. Supp. 55, 58 (E.D.N.Y. 1996). Moreover, "'the potential loss of . . . the advantage of being the pioneer in the field and the market leader[ ] may constitute irreparable harm.'" Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 297 F. Supp. 2d 463, 492 (N.D.N.Y. 2003) (quoting Comp Assocs. Int'l Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992)).

Here, Hutzler has offered evidence that its sales have dropped significantly since Bradshaw's products entered the marketplace in 2011, and that it has lost certain customers who have switched to Bradshaw's products. (See Ehrenhaus Decl. ¶ 12, Ex. B; Hutzler Decl. ¶¶ 29, 32-35) The effect of Hutzler's loss of clients is difficult to quantify, and Hutzler may not be able to recover these lost relationships. Moreover, Hutzler has demonstrated that if Bradshaw is not

31

enjoined, Hutzler will lose its market leadership.  This showing is sufficient to make out irreparable harm.

Hutzler also argues that "Defendant's distribution of the Infringing Products, if not enjoined, will result in irreparable price erosion of Hutzler's patented products in that Hutzler will be forced to drastically change its pricing structure in order to complete with lower-priced 'knock-off' products."  (Pltf. Br. 15; Hutzler Decl. ¶ 30)  Hutzler maintains that Bradshaw's products "are priced approximately 25-50 percent lower than Hutzler's Food Saver Line products."  (Hutzler Decl. ¶ 27)  It is settled law that "the loss of pricing power resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable."  Mint, Inc. v. Amad, No. 10 Civ. 9395(SAS), 2011 WL 1792570, at *3 (citing Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008) (citing Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market share are evidence of irreparable harm); Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm))).

Hutzler has demonstrated that Bradshaw's products are priced lower than Hutzler's products (Hutzler Decl. ¶ 30; Ehrenhaus Decl., Ex. B) and that it was required to lower its prices in order to avoid losing business to Bradshaw.  (Ehrenhaus Decl. ¶ 13, Ex. C) Accordingly, Hutzler has likewise demonstrated irreparable harm flowing from the continued price erosion it will suffer if Bradshaw is not enjoined.

## IV.   **BALANCE OF HARDHIPS**

Where – as here – plaintiff has demonstrated a likelihood of success on the merits and a likelihood of irreparable harm absent an injunction, a court must next "consider the balance

of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." Salinger, 607 F.3d at 80. "The Court 'must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted.'" Novo Nordisk A/S v. Pfizer, Inc., No. 06 Civ. 5819(LBS), 2006 WL 3714312, at *6 (S.D.N.Y. Dec. 14, 2006) (quoting Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988)).

Here, the balance of hardships factor favors Hutzler. Given the price erosion, loss of market share, and potential loss of market leader position, and the fact that Hutzler's Food Saver Line accounts for 63% of its sales – with the Onion Saver and the Garlic Saver constituting 27% of the company's sales (Ehrenhaus Decl. ¶ 6) – absent an injunction, Hutzler faces the potential destruction of its business. See Tuccillo v. Geisha NYC, LLC, 635 F. Supp. 2d 227, 247 (E.D.N.Y. 2009) (balance of hardships favored movant given that it faced potential destruction of its business).

Bradshaw argues that it "would be harmed by failure to meet the terms of present importation and distribution contracts and be forced to breach its present obligations, which would injure its reputation within the industry, subject it to significant economic harm and hinder its potential to engage in future arrangements with those parties." (Def. Opp. Br. 24; Megorden Aff. ¶ 13) Bradshaw's product line of home goods includes more than 2,400 different items, however. (Megorden Aff. ¶ 2) Accordingly, the impact of an injunction on Bradshaw's business is likely to be much less serious than the absence of an injunction on Hutzler's business.

Moreover, Bradshaw knowingly copied Hutzler's patented designs, and thus assumed the risk that it would suffer financial loss. See Tuccillo, 635 F. Supp. 2d at 247-48

(citing <u>Novartis</u>, 290 F.3d at 596 ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself")).

The Court concludes that the balance of hardships factor weighs in favor of issuing a preliminary injunction.

## V.    **PUBLIC INTEREST**

As the final step in the <u>Salinger</u> analysis, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." <u>Salinger</u>, 607 F.3d at 80 (quoting <u>eBay</u>, 547 U.S. at 391).

"[A]lthough there exists a public interest in protecting rights secured by valid patents," the Federal Circuit has instructed that "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." <u>Hybritech</u>, 849 F.2d at 1458.

Bradshaw has not argued that the public interest would be injured by the grant of preliminary relief, and this Court concludes that the public interest will not be adversely affected by the issuance of a preliminary injunction.

*        *        *        *

Hutzler has demonstrated that (1) it is likely to succeed on the merits of its patent infringement and unfair competition claims; (2) it is likely to suffer irreparable injury in the absence of an injunction; (3) the balance of hardships favors the granting of an injunction; and (4) the public interest will not be disserved by the issuance of an injunction. Accordingly, the <u>Salinger</u> test is satisfied and a preliminary injunction is appropriate.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for a preliminary injunction is

GRANTED.  Plaintiff is directed to submit a proposed order by July 26, 2012.  Defendant will

submit any opposition to Plaintiff's proposed order by July 30, 2012.  The Court will consider an

appropriate Rule 65(c) bond amount once the terms of the preliminary injunction have been

determined.  The Clerk of Court is directed to terminate the motion.  (Dkt. No. 4)

Dated: New York, New York
         July 24, 2012

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge